Tʜᴇ Aʟʟɪᴀɴᴄᴇ ᴛᴏ Eɴᴅ Cʜɪᴄᴋᴇɴs ᴀs Kᴀᴘᴏʀᴏs et al., Appellants, v Nᴇᴡ Yᴏʀᴋ Cɪᴛʏ Pᴏʟɪᴄᴇ Dᴇᴘᴀʀᴛᴍᴇɴᴛ et al., Respondents, et al., Defendants.

First Department, June 6, 2017

**APPEARANCES OF COUNSEL**

*Law Office of Nora Constance Marino*, Great Neck (*Nora Constance Marino* of counsel), for appellants.

*Zachary W. Carter, Corporation Counsel*, New York City (*Damion K.L. Stodola* and *Jane L. Gordon* of counsel), for respondents.

**OPINION OF THE COURT**

GISCHE, J.

The central issue raised by this appeal is whether plaintiffs have a right, via a writ of mandamus, to compel the municipal defendants to enforce certain laws related to preserving public health and preventing animal cruelty, which they allege are violated by Orthodox Jews who perform the religious practice of Kaporos. We affirm Supreme Court's dismissal of the

proceeding against the City defendants, which include the New York City Police Department (NYPD), NYPD's Commissioner and the New York City Department of Health and Mental Hygiene (DOH) (collectively City), because mandamus does not lie where, as here, plaintiffs seek to compel the enforcement of laws and regulations implicating discretionary actions (*New York Civ. Liberties Union v State of New York*, 4 NY3d 175, 184 [2005]).[1, 2]

The individual plaintiffs reside, work or travel within Brooklyn neighborhoods where the non-City defendants engage in the Kaporos ritual every year before Yom Kippur. Plaintiff the Alliance to End Chickens as Kaporos, of which some individual plaintiffs are members, is associated with nonparty United Poultry Concerns, a nonprofit organization promoting compassionate and respectful treatment of domestic fowl. The non-City defendants are individual Orthodox Jewish rabbis, members of yeshivas or other Orthodox Jewish religious institutions, and several Orthodox Jewish religious institutions, all based in Kings County.

Kaporos is a customary Jewish ritual practiced by the non-City defendants, who are ultra Orthodox. It dates back to biblical times and occurs only once a year, the few days immediately preceding the holiday of Yom Kippur. Adherents of Kaporos believe this ritual is required by religious law and that it brings atonement and redemption. The ritual entails grasping a live chicken and swinging the bird three times overhead while saying a prayer that symbolically asks God to transfer the practitioners' sins to the birds. Upon completion of the prayer, the chicken is killed in accordance with the kosher dietary laws, by slitting the chicken's throat. Its meat is then required to be donated to the poor and others in the community. Each year thousands of chickens are sacrificed in furtherance of this ritual and the practice takes place outdoors, on public streets in Brooklyn, and in full public view.

Plaintiffs allege that the manner in which Kaporos is practiced is a health hazard and cruel to the animals. They

---

1. This action was originally styled as a plenary action against individual defendants and the City defendants. Supreme Court appropriately converted the relief against the City defendants into a CPLR article 78 proceeding seeking mandamus.

2. Plaintiffs also sought a preliminary injunction against the practice of Kaporos, pending resolution of the underlying nuisance action. Supreme Court denied that relief. Although plaintiffs originally appealed from that portion of the order, they subsequently stipulated to withdraw that issue from the appeal.

decry the practice as "party-like" and having a "carnival" atmosphere. They contend the practice involves the erection of makeshift slaughterhouses in which "[d]ead chickens, half dead chickens, chicken blood, chicken feathers, chicken urine, chicken feces [and] other toxins . . . consume the public streets" (amended complaint ¶ 168). They also allege that there is blatant animal abuse and cruelty (*id.* ¶ 174). It is plaintiffs' contention that Kaporos is a public nuisance to all those who, like them, pass through these locations for day to day activities, including going home, to work, or to shop. Their goal is to stop this practice. They argue that there are other, better ways for Kaporos adherents to practice their faith and express their devotion, including by using coins instead of live chickens. They denounce Kaporos as "a far cry from a solemn religious ritual." These claims are disputed by the non-City defendants, who otherwise claim that they have a constitutional right to practice Kaporos.

In seeking the remedy of mandamus against the City defendants, plaintiffs claim that this ritual violates numerous laws, rules and regulations, including Agriculture and Markets Law §§ 96-a and 96-b (requiring licensing of places where fowls are slaughtered or butchered); Labor Law § 133 (2) (o) (prohibiting employment of a minor in a slaughterhouse); 1 NYCRR 45.4 (sanitary precautions against avian influenza when entering premises containing live poultry); Administrative Code of City of NY § 18-112 (d) (no slaughterhouse in parts of Brooklyn); former New York City Health Code (24 RCNY) § 153.09 (no blood, offensive animal matter, or dead animals to be put on city streets); former New York City Health Code (24 RCNY) § 153.21 (a) (persons contracted or undertaken to remove dead or diseased animals must do so promptly); New York City Health Code (24 RCNY) § 161.11 (prevention of animal nuisances); New York City Health Code (24 RCNY) § 161.19 (c) (live poultry intended for sale prohibited on the same premises as a multiple dwelling); New York City Health Code (24 RCNY) § 161.19 (b) (areas of slaughter to be kept clean and free of animal nuisances); Agriculture and Markets Law §§ 353 and 371 (prohibiting animal cruelty); Agriculture and Markets Law § 355 (prohibiting abandonment of animals to die in a street); Agriculture and Markets Law § 359 (prohibiting carrying animals in a cruel manner); former New York City Health Code (24 RCNY) § 161.03 (a) (prohibition against animal blood, feces and body parts on pubic sidewalks); and

New York City Department of Sanitation Rules (Administrative Code) § 16-118 (6) (no offensive animal material shall be allowed to fall on a person or run into any street or public place).

Plaintiffs claim that they are entitled to have the courts compel the City to enforce these laws. They seek to have this Court direct the City to "enforce the law, issue summonses, issue arrests, and issue violations when such situations are warranted" (amended complaint ¶184).[3]

Article 78 is the codification of the common-law writs, including a writ of mandamus to compel (CPLR 7801, 7803 [1]). Mandamus to compel is a judicial command to an officer or body to perform a specified ministerial act that is required by law to be performed. It does not lie to enforce a duty that is discretionary (*Matter of Hamptons Hosp. & Med. Ctr. v Moore*, 52 NY2d 88, 96 [1981]). The availability of mandamus to compel the performance of a duty does not depend on the applicant's substantive entitlement to prevail, but on the nature of the duty sought to be commanded—i.e., mandatory, non-discretionary action (*id.* at 97). A ministerial act is best described as one that is mandated by some rule, law or other standard and typically involves a compulsory result (*New York Civ. Liberties Union*, 4 NY3d at 184). Discretionary acts, on the other hand, are not mandated and involve the exercise of reasoned judgment, which could typically produce different acceptable results (*id.*). Mandamus is not available to compel an officer or body to reach a particular outcome with respect to a decision that turns on the exercise of discretion or judgment. In other words, mandamus will lie to compel a body to perform a mandated duty, not how that duty shall be performed (*Klostermann v Cuomo*, 61 NY2d 525, 539-540 [1984]). It lies "only to enforce a clear legal right where the public official has failed to perform a duty enjoined by law" (*New York Civ. Liberties Union*, 4 NY3d at 184).

---

3. We do not agree with the dissent's conclusion that plaintiffs are not seeking to compel a particular action, but seek only to compel the City defendants to investigate. While the pleadings broadly claim such relief along with other relief, the facts plaintiffs allege simply belie any claim that they only seek the limited relief of an investigation. Plaintiffs concede that investigations were, in fact, made of their complaints, albeit, in their opinion, belatedly. Moreover, they admit that the City defendants were fully aware of the circumstances attendant to Kaporos, but failed to take the action they believe is necessary. It is clear that plaintiffs simply disagree with how the City defendants have acted.

Mandamus is generally not available to compel government officials to enforce laws and rules or regulatory schemes that plaintiffs claim are not being adequately pursued (*see e.g. Jones v Beame*, 45 NY2d 402, 409 [1978], citing *People ex rel. Clapp v Listman*, 40 Misc 372 [Sup Ct, Special Term, Onondaga County 1903] [mandamus does not lie to compel enforcement of Sunday "blue" laws]; *Matter of Walsh v LaGuardia*, 269 NY 437 [1936] [no right to compel Mayor and Police Commissioner to prohibit operators of nonfranchised bus routes]; *Matter of Perazzo v Lindsay*, 30 AD2d 179 [1st Dept 1968], *affd* 23 NY2d 764 [1968] [no right to compel enforcement of laws governing operation hours of coffee houses]; *Matter of Morrison v Hynes*, 82 AD3d 772 [2d Dept 2011] [cannot compel the initiation of a prosecution]; *Matter of Bullion v Safir*, 249 AD2d 386 [2d Dept 1998] [no mandamus to compel police to make arrests]). This reflects the long-standing public policy prohibiting the courts from instructing public officials on how to act under circumstances in which judgment and discretion are necessarily required in the fair administration of their duties.

We hold that the laws which plaintiffs seek to compel the City defendants to enforce in this action involve the judgment and discretion of those defendants. This is because the laws themselves implicate the discretion of law enforcement and do not mandate an outcome in their application. With the exception of Agriculture and Markets Law § 371 (addressed separately below), there is nothing in the plain text of any of the laws and regulations relied upon by plaintiffs to suggest that they are mandatory. Nor is there anything in the legislative history supporting a conclusion that any of the implicated laws and regulations are mandatory. There is no express provision designating Kaporos as a prohibited act. There are disputes about whether the conduct complained of is in violation of the implicated laws and regulations. There are disputes about whether and to what extent the implicated laws can be enforced without violating constitutional rights belonging to the non-City defendants. Rituals involving animal sacrifice are present in some religions and although they may be upsetting to non-adherents of such practice, the United States Supreme Court has recognized animal sacrifice as a religious sacrament and decided that it is protected under the Free Exercise Clause of the Constitution, as applied to the states through the Fourteenth Amendment (*Church of Lukumi Babalu Aye, Inc. v Hialeah*, 508 US 520, 531 [1993]).

Consequently, the decision whether and how to enforce these laws and regulatory provisions allegedly violated during Kaporos implicates the reasoning and discretion of the City defendants and the law enforcers. None of the laws or regulations plaintiffs rely on preclude the City defendants from deciding whether or not to enforce those laws in the context of Kaporos. Plaintiffs do not have a "clear legal right" to dictate which laws are enforced and how, or against whom. Determining which laws and regulations might be properly enforced against the non-City defendants without infringing upon their free exercise of religion involves the exercise of reasoned judgment on the part of the City defendants. The outcome cannot be dictated by the court through mandamus.

█ We also reject any argument that Agriculture and Markets Law § 371 may provide a basis for the court to mandate that the police either issue an appearance ticket, or summon, or arrest and bring before the court, the non-City defendants for having practiced animal cruelty.

Agriculture and Markets Law § 371 provides in pertinent part that:

> "A constable or police officer *must*, and any agent or officer of any duly incorporated society for the prevention of cruelty to animals may issue an appearance ticket pursuant to section 150.20 of the criminal procedure law, summon or arrest, and bring before a court or magistrate having jurisdiction, any person offending against any of the provisions of article twenty-six of the agriculture and markets law" (emphasis added).

Notwithstanding the use of the word "must" in the statute,[4] it is still subject to the definition of animal cruelty as otherwise defined in the Agriculture and Markets Law. Agriculture and Markets Law § 350 (2) defines "torture" or "cruelty" to include "unjustifiable physical pain, suffering or death." Thus, a determination of whether a practice in killing animals is "unjustifiable" implicates discretion and is not susceptible to a predictable, mandated outcome. For that reason, the parties' dispute concerning whether plaintiffs made complaints to law enforcement is irrelevant because enforcement of this statute is

---

4. The "must" language pertains only to constables or the police. Consequently, by its terms it cannot support a claim for mandamus against the DOH.

discretionary. The dissent's reasoning that a hearing should be held to determine whether the killing of these birds is "justified" proves the point. There is no ministerial determination to be made about the justification for killing chickens. Thus, the City defendants' decision of whether action is necessary, and if so, the nature of such action, is inherently discretionary. Opening up claims of this nature to discovery and possible trials would be an unjustified intrusion into the everyday affairs of the City defendants. Consequently, since the City defendants may exercise their judgment in deciding whether there has been a violation of Agriculture and Markets Law § 371, they cannot be compelled to act a certain way (see *Klostermann* at 540).

*Matter of Jurnove v Lawrence* (38 AD3d 895 [2d Dept 2007]), relied upon by plaintiffs, does not dictate a different result. The issue in *Jurnove* was that the police had adhered to an internal policy of referring all article 26 violations, most of which involved animal cruelty, to the local society for prevention of cruelty to animals (SPCA) (*Jurnove* at 896). The Court held that a hearing was necessary on the issue of whether the officers had "abdicated their statutorily-imposed duty" by routinely referring the claims to the SPCA without considering them at all (*id.*). At bar, however, the plaintiffs are really challenging the core decision by law enforcement not to arrest or take other legal action against the non-City defendants for what plaintiffs believe are violations of law. In other words, they are seeking to drive a particular outcome. Notably, the Court in *Jurnove* observed that "[a] subordinate body can be directed to act, but not how to act," noting further that law enforcement has "broad discretion" in allocating resources and devising enforcement strategies (*id.*). This statement of law is harmonious with controlling Court of Appeals precedent, reminding courts "to avoid . . . the fashioning of orders or judgments that go beyond any mandatory directives of existing statutes and regulations and intrude upon the policy-making and discretionary decisions that are reserved to the legislative and executive branches" (*Klostermann*, 61 NY2d at 541).

Plaintiffs' own claims demonstrate that the City defendants have not been derelict in their duties. Although plaintiffs deride NYPD for, and accuse it of, aiding and abetting the non-City defendants by enclosing the Kaporos area with barriers, placing orange cones, providing generators to supply light for the area and erecting "no parking" signs, these actions contain the

event and maintain order, each of which is a proper exercise of the NYPD's law enforcement obligations. As for DOH, it too has acted on plaintiffs' complaints, by sending an investigator. Notwithstanding plaintiffs' complaint that the investigator arrived after Kaporos ended, plaintiffs have no clear right to dictate when, how, or if at all, such investigation takes place.

Accordingly the order of the Supreme Court, New York County (Debra A. James, J.), entered September 24, 2015, which, upon converting the plenary action as against the City defendants to a CPLR article 78 proceeding, granted the City defendants' motion to dismiss the proceeding, should be affirmed, without costs.

GESMER, J. (dissenting). Because I believe that plaintiffs have stated a claim for mandamus relief sufficient to survive a motion to dismiss, I respectfully dissent.

Plaintiff Alliance to End Chickens as Kaporos, of which some individual plaintiffs are members, advocates for the substitution of coins, or other non-animal symbols of atonement, for chickens in the religious practice of Kaporos.[1] In this plenary action, plaintiffs seek to enjoin the performance of the religious ritual known as Kaporos to the extent that it is practiced with live chickens. As plaintiffs point out, other Orthodox Jewish communities use coins in place of live chickens, and plaintiffs do not oppose this practice.

As we must on a motion to dismiss, I accept the facts alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit into a cognizable legal theory (CPLR 3211; *Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). I have also considered plaintiffs' affidavits, which may be submitted on a motion to dismiss to remedy inartful pleading of potentially meritorious claims (*id.* at 88).

Plaintiffs claim that, for as many as four days before Yom Kippur, truckloads of crates overcrowded with live and some dead chickens are left on the streets of Brooklyn, with as many as 16 birds per crate, stacked up to 10 crates high. In the days before the birds are slaughtered, they remain crammed into

---

1. Because the motion court converted the claims against the City defendants into a CPLR article 78 proceeding, the City defendants are denominated respondents, and the plaintiffs are denominated petitioners in that part of this matter. For simplicity, they are referred to as defendants and plaintiffs throughout this opinion.

their cages, are not given food or water, are not protected from the elements or from feces and urine falling from the crates above, and sometimes fall out of the crates onto the public street. Birds are injured during the ritual, and their throats are frequently cut incorrectly, to the extent that the carotid artery is not completely severed and the birds die an unnecessarily slow and painful death. The slaughter takes place on public streets in makeshift open-air slaughterhouses, and dead and nearly dead birds, blood, excrement, used tarps and gloves, and other by-products of the slaughter are left on the street for days afterwards. This creates an unbearable stench and a health hazard both before and after the ritual. Children are present during, and sometimes assist in, the slaughter. Plaintiffs' toxicology expert states in his affidavit that these conditions create a risk of public exposure to, and spreading of, Salmonella, Campylobacter, strains of influenza, and other pathogens, toxins, and biohazards, which can cause respiratory complications, dermatitis, and infectious diseases in humans. The non-City defendants do not seek or obtain required permits, and there is no oversight and no system for cleanup. At the time the matter was argued before the motion court, the non-City defendants had purchased 50,000 live chickens for the approaching holiday. Plaintiffs have complained repeatedly about the situation and obtained no meaningful response.

Plaintiffs seek mandamus relief against the City defendants, claiming that the City defendants have failed and refused to act on their complaints, and that the police actively assist the non-City defendants by blocking off streets and allowing practitioners to use Police Department generators, barricades, traffic cones, and "no parking" signs during the event.

Plaintiffs claim that, by their actions, the non-City defendants have violated, and the City defendants have failed to enforce and/or have "aided and abetted" the non-City defendants in violating, some 17 state and local statutes, regulations, and rules regarding the keeping and slaughter of animals, public health and safety, and animal cruelty, including provisions of the Agriculture and Markets Law, the Labor Law, the New York City Health Code, the Rules and Regulations of the New York City Department of Sanitation, and the rules of the New York City Street Activity Permit Office. They further allege that defendants have unreasonably interfered with the rights of plaintiffs and the public, and have caused a public nuisance. Plaintiffs seek a permanent injunction against the

non-City defendants to prevent them from erecting slaughter-houses and slaughtering chickens on public streets and sidewalks. Plaintiffs seek an order of mandamus against the City defendants, compelling them to

> "uphold the law, properly issue summonses where warranted, properly issue violations where warranted, properly engage in arrests where warranted [in connection with] Kaporos . . .

> "[and] preventing the . . . City Defendants from encouraging, assisting, and participating in . . . Kaporos . . . [and] from aiding and abetting the [non-City] Defendants to engage in illegal acts . . . and improperly blocking off specific streets and sidewalks."

By order entered September 24, 2015, the motion court converted the plenary action as against the City defendants into a proceeding pursuant to article 78 of the Civil Practice Law and Rules, and granted the City defendants' motion to dismiss it as against them. The motion court based its dismissal as against the City defendants on its finding that plaintiffs had failed to allege that any of the City defendants had ever tried to file a complaint with regard to a violation of the Agriculture and Markets Law or that the police ever refused to accept such a complaint. As discussed below, the record does not support this finding.

Section 7803 of the Civil Practice Law and Rules permits article 78 petitions in the nature of mandamus to determine "whether the body or officer failed to perform a duty enjoined upon it by law" (CPLR 7803 [1]). Mandamus lies "only to enforce a clear legal right where the public official has failed to perform a duty enjoined by law" (*New York Civ. Liberties Union v State of New York*, 4 NY3d 175, 184 [2005]). "[I]f a statutory directive is mandatory, not precatory, it is within the courts' competence to ascertain whether an administrative agency has satisfied the duty that has been imposed on it by the Legislature and, if it has not, to direct that the agency proceed forthwith to do so" (*Klostermann v Cuomo*, 61 NY2d 525, 531 [1984]). It is the "function of mandamus to compel acts that officials are duty-bound to perform, regardless of whether they may exercise their discretion in doing so" (*id.* at 540). However, courts must not intrude into the "broad legislative and administrative policy beyond the scope of judicial correction"

(*Jones v Beame*, 45 NY2d 402, 408 [1978]). Accordingly, "rarely, if ever, should mandamus lie to command the Commissioner of Public Safety to enforce the Sunday 'blue' laws or the ordinance forbidding the riding of bicycles on the sidewalk" (*id.* at 409). Mandamus is not available to compel a general course of conduct by an official (*Matter of Walsh v LaGuardia*, 269 NY 437, 442 [1936]; *New York Civ. Liberties Union*, 4 NY3d at 184).

The motion court dismissed the proceeding as against the City defendants on two bases, both of which I conclude are faulty.

First, it found that the duties at issue are largely discretionary and not ministerial, and thus mandamus will not lie. However, where "the legislation in question established a standard of conduct which executive officers must meet unless or until the legislative body changes it, a dispute over compliance is generally considered justiciable because the courts can compel performance of the statutory command" (*Matter of Natural Resources Defense Council v New York City Dept. of Sanitation*, 83 NY2d 215, 220 [1994]). "The character of the duty, and not that of the body or officer, determines how far performance of the duty may be enforced by mandamus" (*Klostermann*, 61 NY2d at 540).

Here, the actions at issue are mandatory not discretionary. The Department of Health and Mental Hygiene (DOH) is required to enforce the Health Code (*New York City Coalition to End Lead Poisoning v Koch*, 138 Misc 2d 188, 191 [Sup Ct, NY County 1987], *affd* 139 AD2d 404 [1st Dept 1988]). Similarly, pursuant to section 435 (a) of the New York City Charter, the New York City Police Department "shall have the power and it shall be their duty" to, inter alia,

> "disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks and places; . . . guard the public health, preserve order at . . . all public meetings and assemblages; subject to the provisions of law and the rules and regulations of the commissioner of traffic, regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; remove all nuisances in the public streets, parks and places;

. . . inspect and observe all places of public amusement . . . ; enforce and prevent the violation of all laws and ordinances in force in the city; and for these purposes to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses."

In addition, Agriculture and Markets Law § 371 directs that a "police officer must . . . issue an appearance ticket pursuant to section 150.20 of the criminal procedure law, summon or arrest, and bring before a court or magistrate having jurisdiction, any person offending against any of the provisions of article twenty-six of the agriculture and markets law." The mandatory nature of this provision is "a stark and surprising contrast to the permissive language found in the arrest provisions of the New York Criminal Procedure Law" (Jed L. Painter, 2016 Practice Commentaries, McKinney's Cons Laws of NY, Book 2B, Agriculture and Markets Law § 371, Cum Pocket Part at 166). The article which the police are enjoined to enforce prohibits animal cruelty, including torture, unjustifiable injury, maiming, mutilating or killing of any animal, as well as depriving an animal of "necessary sustenance, food or drink," or causing such treatment (Agriculture and Markets Law § 353). It further provides that such acts constitute a class A misdemeanor punishable by imprisonment for not more than one year, a fine of up to one thousand dollars, or both (Agriculture and Markets Law § 353; see also Penal Law §§ 60.01 [3] [c]; 70.15, 80.05). While the majority is correct that section 350 of the Agriculture and Markets Law defines animal cruelty as the infliction of "unjustifiable" pain, suffering or death (Agriculture and Markets Law § 350 [2]), it is not at all clear that the alleged treatment of poultry in the days leading up to Kaporos, or in improper slaughter, is justifiable. None of the defendants has claimed that violating the Agriculture and Markets Law, or any of the other laws plaintiffs claim the non-City defendants have violated, is necessary to carry out the religious ritual and thus justifiable. In addition, plaintiffs have raised questions about whether the slaughtered birds are donated for human consumption as the non-City defendants claim, and, if so, whether the proper precautions are being taken to ensure consuming them is safe, each of which also bears on whether the cruelty alleged is justifiable.

Thus, while the City defendants may exercise discretion in the process of determining whether a violation has occurred

and, if so, how to respond to it, they have, at a minimum, an obligation to determine whether or not a reported violation has occurred. Pursuant to section 371 of the Agriculture and Markets Law, if the police determine that they have probable cause to believe that a violation of article 26 of the Agriculture and Markets Law has occurred, they "must" issue an appearance ticket or summons or make an arrest.

Second, the motion court incorrectly found that plaintiffs had not shown that any of them had tried to file a complaint with regard to violations under the Agriculture and Markets Law. The motion court found that plaintiffs' failure to do so distinguished this case from *Matter of Jurnove v Lawrence* (38 AD3d 895 [2d Dept 2007]), in which the Second Department held that the petitioners had stated a mandamus cause of action where they asserted that the local police failed and refused to accept their complaints alleging violations of article 26 of the Agriculture and Markets Law.

This was error for two reasons. First, plaintiffs Rina Deych, Lisa Renz, and Steven and Vanessa Dawson submit affidavits in which they describe instances when they approached police officers personally or called the DOH, 911, and/or 311 to report animal cruelty and/or conditions posing a public health hazard, and when they participated in or observed protests concerning Kaporos in the presence of the police. In each instance described, their action led to no meaningful action by the police to address the violations of the Agriculture and Markets Law or by the DOH to respond to complaints of hazardous conditions.

Second, the City defendants do not claim that they have ever made a determination that the acts reported do not constitute violations of the statutes, regulations and rules cited by plaintiffs, including article 26 of the Agriculture and Markets Law. I disagree with the majority that plaintiffs seek to direct the City defendants how to act. The complaint seeks to compel them to issue summonses or make arrests "where warranted," and to refrain from "aiding and abetting" the non-City defendants in violating the law. I view the complaint as seeking to compel the City defendants not to abdicate their mandatory duty.

Indeed, at least one plaintiff alleges that two police officers admitted to being "horrified" by what they saw when they arrived in response to her call, and that they were unaware of their obligation to enforce the Agriculture and Markets Law

before she showed them the relevant sections. Nevertheless, she was told by the officers that they had "orders from on high not to disturb practitioners" of Kaporos. Other plaintiffs allege that their complaints to the police, the DOH, and/or 311 were not addressed at all. One plaintiff claims that the DOH did not investigate the area in response to her complaint until two months after Kaporos had ended. Unsurprisingly, they found no evidence of the blood, fecal matter, used gloves and feathers she had reported being on the street. In my view, these claims are sufficient to withstand a motion to dismiss plaintiffs' mandamus claim. If, as plaintiffs allege, the City defendants have made a policy decision to take no action against Kaporos practiced with chickens on the public streets, without even an investigation, this would appear to be an abdication, rather than, as the majority states, a "proper exercise" of the City defendants' obligations. Moreover, if, as plaintiffs allege, the City defendants are assisting the non-City defendants to violate the law, their provision of supplies and assistance with street closures would not appear to be a proper exercise of discretion.[2]

The portion of plaintiffs' complaint that seeks to compel the City defendants to "uphold the law" seeks to compel a general course of conduct, for which mandamus relief is not available. Accordingly, I agree that that portion of the complaint should be dismissed (*Walsh*, 269 NY at 442; *New York Civ. Liberties Union*, 4 NY3d at 184). However, "to the extent that plaintiffs can establish that defendants are not satisfying nondiscretionary obligations to perform certain functions, they are entitled to orders directing defendants to discharge those duties" (*Klostermann*, 61 NY2d at 541; *see also Matter of Jurnove v Lawrence*, 38 AD3d 895 [2007]). Since, in my view, plaintiffs have established, at a minimum, that the police have a mandatory duty under the Agriculture and Markets Law, that portion of their complaint seeking an order compelling them to "issue summonses where warranted, . . . issue violations where warranted [and] properly engage in arrests where warranted" should not be subject to dismissal on this motion. Plaintiffs' allegation that the City defendants "encourag[e], assist[ ], and participat[e]" in the non-City defendants' violation of the speci-

---

2. For example, plaintiffs allege that the City defendants "aid and abet" the non-City defendants' violation of Administrative Code of the City of New York § 18-112 (d), which prohibits the erection of slaughterhouses "or any other . . . calling, which may be in anywise dangerous, obnoxious or offensive to the neighboring inhabitants" along Eastern Parkway or streets intersecting Eastern Parkway.

fied laws and regulations is essentially an allegation that they have abdicated their duty to the point that they actively undermine a law they are mandated to enforce. Therefore, this is also an appropriate subject of mandamus relief (*see Matter of Jurnove*, 38 AD3d at 896).[3] Accordingly, I would vote to reverse the dismissal of plaintiffs' mandamus cause of action against the City defendants, except to the extent that plaintiffs seek to compel the City defendants to "uphold the law" as a general matter.

In reaching this conclusion, I intimate no view as to the merits of plaintiffs' claims but I would permit them to proceed with discovery and a determination on the merits. Furthermore, I am by no means taking lightly the constitutional issues implicated by governmental involvement in religious activities. Plaintiffs' claims are all predicated on their allegations that the challenged acts take place in public places, on public streets and sidewalks, not within the confines of a religious institution or on its grounds (*cf. Church of Lukumi Babalu Aye, Inc. v Hialeah*, 508 US 520 [1993] [invalidating laws which barred religious practice of animal sacrifice, even if practiced in private]). It appears that a court could grant the relief that plaintiffs seek without infringing on religious freedom.

MOSKOWITZ and FEINMAN, JJ., concur with GISCHE, J.; ANDRIAS, J.P. and GESMER, J., dissent in an opinion by GESMER, J.

Order, Supreme Court, New York County, entered September 24, 2015, affirmed, without costs.

---

**3.** I would also find that plaintiffs have a right to the relief they seek. The City defendants rely mainly on their argument that plaintiffs have failed to show a mandatory duty, and do not focus on whether plaintiffs have a legal right to the relief they seek. Plaintiffs clearly have a right to the relief they seek in the same sense that the petitioner National Resources Defense Council had a right to seek compliance with a local law requiring the Department of Sanitation to establish a recycling program in *Matter of Natural Resources Defense Council v New York City Dept. of Sanitation* (83 NY2d 215 [1994]) and petitioner citizens had a right to have their complaints of animal cruelty responded to by police in *Matter of Jurnove v Lawrence* (38 AD3d 895 [2007]).